# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**Executone of Columbus, Inc.,** *et al.***,**

      **Plaintiffs,**

**-v-**                                   **Case No.:  2:06-cv-126**
                                                       **JUDGE SMITH**
                                                       **Magistrate Judge Abel**

**Inter-Tel, Inc.,** *et al.,*

      **Defendants.**


## OPINION AND ORDER

Plaintiffs Executone of Columbus, Inc. ("Executone"), Executone Communications Solutions, Inc., CT-Innovations, LLC, Ideacom of the Gulf Coast, Inc., Ideacom Technologies of Georgia, Inc., and Ideacom Technologies, Inc. (collectively "Plaintiffs"), bring this action for breach of contract and promissory estoppel against Defendants Inter-Tel, Inc. and Inter-Tel Business Information Systems, Inc. (collectively "Defendants" or "Inter-Tel").  Defendants counterclaim for breach of contract.  This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 88) and Defendants' Supplemental Motion for Summary Judgment (Doc. 138), both which seek judgment on Plaintiffs' breach of contract and promissory estoppel claims (Doc. 88).   For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 88) and **DENIES** Defendants' Supplemental Motion for Summary Judgment (Doc. 135).

# I.  BACKGROUND

Each of the Plaintiffs is a company that sells telephony products to consumers.  Between October 1, 1996 and March 29, 1999, Plaintiffs entered into Distributor Agreements with Executone, a manufacturer of telephony products.  The Distributor Agreements ran to the end of 2001 and were not renewed.

The purpose of each Distributor Agreement was to appoint each Plaintiff as an "Authorized Distributor of the products described in Exhibit B (the 'Authorized Products'), including spare parts therefore, and as a licensee of any Software imbedded therein or otherwise an integral part thereof described in Exhibit B (the 'Authorized Software')" so that Plaintiffs could "promote and service . . . the Authorized Products . . .and . . . sublicense the use of the Authorized Software in conjunction with the sale of the Authorized Products. Distrib. Agmt. at Recitals.  Pursuant to the Distributor Agreements, each distributor was required to purchase a quota of products to "maintain a sufficient inventory of the Authorized Products," and to "make sales of the Authorized Products" to customers within a designated sales territory. Distrib. Agmt. § 4 and § 7(a)(ii).  In addition, Plaintiffs were obligated to service customers in their area. Distrib. Agmt. § 5.

Plaintiffs contend that from the mid-1990s until 2000, Executone breached the Distributor Agreements by providing poor quality products and poor technical support, thereby causing damage to Plaintiffs' business and reputations.

On October 17, 1999, Executone and Inter-Tel entered into an Asset Purchase Agreement ("APA") whereby Inter-Tel was to purchase all of the assets used or necessary to the operation of the Computer Telephony Business, including the Distributor Agreements.  The sale of assets by

Executone to Inter-Tel was closed on January 1, 2000.  Plaintiffs allege that six months prior to

the sale, in July 1999, Inter-Tel had formulated a plan to discontinue the Executone product line

and to convert Plaintiffs' customer base to Inter-Tel's product line.  Specifically, Plaintiffs claim

that "Inter-Tel did not inform the dealers of its true plan for the Executone acquisition.  Instead,

[Inter-Tel] made a series of misrepresentations to the dealers designed to keep them in the fold

while [Inter-Tel] implemented its true plans."  The alleged misrepresentations included:

- On October 19, 1999, sending a letter to Executone distributors, stating that Inter-Tel planned to continue Executone products and its dealer network indefinitely, contrary to Inter-Tel's "true plan." Cmplt. ¶¶32-33.

- In early November 1999, conducting a meeting in Phoenix, Arizona, at which Inter-Tel repeated the statements of the October 19, 1999 letter and provided a detailed plan to the dealers about the continuation of Executone products, contrary to Inter-Tel's "true plan." Cmplt. ¶¶32, 34.

- On January 11, 2000, sending a letter to Executone distributors, telling them that the Executone Distributor Agreements would be continued and that the Phoenix product line would be ready for production by July 1, 2000, contrary to Inter-Tel's "true plan." Cmplt. ¶¶ 32, 35.

- On January 28, 2000, sending a letter to dealers stating that Executone products would be ready on specific dates, while knowing that such dates were not feasible. Cmplt. ¶37.

- On February 3, 2000, repeating the allegations of the January 11, 2000 letter in a meeting of Executone dealers. Cmplt. ¶38.

- In February 2000, providing distributors with a "comfort letter" for their use with customers, assuring customers that Inter-Tel was committed to continuing the Executone product lines, contrary to Inter-Tel's "true plan." Cmplt. ¶32, 39.

- On June 29, 2000, sending a letter to The Distributors saying that it would continue development of the Phoenix product line contrary to Inter-Tel's "true plan." See Compl. at ¶¶ 32, 45.

On February 16, 2006, Plaintiffs filed this action against Defendants, asserting breach of

contract and promissory estoppel claims. On October 20, 2006, Defendants filed their first amended counterclaim, asserting counterclaims for breach of contract and accounting. On November 3, 2006, Plaintiffs filed a motion to dismiss, seeking dismissal of Defendants' counterclaim for accounting. The Court, in its April 16, 2007 OPINION AND ORDER, granted Plaintiffs motion, dismissing Defendants' counterclaim for accounting. On March 26, 2008, Defendants filed a motion for summary judgment, and on August 11, 2008, Defendants filed a supplemental motion for summary judgment. Defendants seek judgment as a matter of law on Plaintiffs' promissory estoppel and breach of contract claims. The motions for summary judgment have been fully briefed and are ripe for review.

## II. SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[1] The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary

---

[1] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

judgment.'" *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III.   DISCUSSION

Plaintiffs allege claims for breach of contract and promissory estoppel arising out of their agreements with Inter-Tel to distribute telephony products. Defendants argue there are no genuine disputes of material fact and that they are entitled to summary judgment on both of Plaintiffs' claims. The Court examines Defendants' arguments with respect to each claim in turn.

### A.      Plaintiffs' Breach of Contract Claims

Defendants first argue that Plaintiffs' breach of contract claims are subject to and time-barred by the Uniform Commercial Code's ("UCC") four-year statute of limitations period because the Distributor Agreements are predominantly contracts for the sale of goods. Plaintiffs dispute the applicability of the UCC's limitations period, arguing that the Distributor Agreements are primarily service contracts, and therefore, their breach of contract claims are properly plead within the fifteen-year limitations period provided in O.R.C. § 2305.06. Alternatively, Defendants assert that Plaintiffs' breach of contract claims are time-barred, in whole or in part, because of

Ohio's "borrowing statute." Plaintiffs also dispute the applicability of Ohio's borrowing statute. Finally, Defendants argue they are entitled to summary judgment on Plaintiffs' breach of contract claims because they did not assume liability for any breaches of contract by their predecessor, Executone Information Systems ("EIS"), and they cannot be held liable for their own alleged breaches due to prior material breaches by Plaintiffs. Plaintiffs maintain that Defendants are liable for EIS's pre-acquisition breaches of the Distributor Agreements and further contend that there are disputes of fact as to whether Plaintiffs actually breached the agreements. For the following reasons, the Court finds Defendants' first argument in favor of summary judgment dispositive, and consequently, the Court declines to consider Defendants' additional arguments in favor of summary judgment.

The procedural law of the forum statutes governs time restrictions on an action for breach of contract. *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998); *Curl v. Greenlee Textron, Inc.*, 404 F.Supp.2d 1001, 1004-05 (S.D. Ohio 2005) (Marbley, J.) (noting that, where a court exercises diversity jurisdiction, the procedural law of the forum governs time restrictions on an action for breach).

Ordinarily, in Ohio, claims for breach of contract are governed by the fifteen-year limitations period provided in O.R.C. § 2305.06. Contracts relating to the sale of goods,

however, are governed by the UCC's,[2] four-year limitations period. *See* O.R.C. § 1302.98 (UCC Statute, establishing four-year statute of limitations for breach claims relating to contracts for the sale of goods).

Here, the parties agree that the Distributor Agreements are mixed contracts for the sale of goods and services. Where there is a mixed contract for the sale of goods and services, state and federal courts in Ohio utilize the "predominant purpose" test to determine whether or not the UCC applies. *See*, *e.g.*, *Mecanique C.N.C., Inc. v. Durr Envt'l, Inc.*, 304 F.Supp.2d 971, 976 (S.D. Ohio 2004) (Marbley, J.) (applying the "predominant purpose" test); *Allied Erecting & Dismantling Co. v. Auto Baling Co.*, 69 Ohio App.3d 502, 508 (1990) (same); *Allied Industrial Serv. Corp. v. Kasl Iron & Metels, Inc.*, 62 Ohio App.2d 144, 147 (1977). The "predominant purpose" test was first articulated in *Allied*, where the court stated that "the test for [determining whether the contract falls under the UCC] is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved." 62 Ohio App.2d at 147. In *Heidtman Steel Products, Inc. v. Compuware Corporation*, Judge Carr offered the following guidance in applying

---

[2]Ohio has adopted the applicable provision of the UCC. *See* O.R.C. §§ 1301.02 et seq. Article 2 of the UCC, O.R.C. §§ 1302.01-1302.98, applies to "transactions in goods." "Goods" is defined as follows:

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in section 1302.03 of the Revised Code.

O.R.C. § 1302(8).

the predominate purpose test:

> In ascertaining whether goods or services predominate, I must examine four factors: 1) the nature and language of the contract; 2) the nature of the business of the supplier or seller; 3) the price or value allocation in the contract between goods and services to be provided; and 4) the issues involved in the dispute. * * * It also is useful to consider the compensation structure of the contract in this analysis.

2000 WL 621144, *5 (N.D. Ohio 2000) (citations omitted). In mixed contract cases, the burden of proof lies with the party who asserts that the contract is governed by the UCC. *Mecanique*, 304 F.Supp.2d at 976. Thus, in the instant case, Defendants have the burden of proving that the predominate purpose of the Distributor Agreement is the sale of goods.

Normally, whether or not a transaction involves goods or services is a question of fact for the jury. *Mecanique*, 304 F.Supp.2d at 976-77 (citing *Valleaire Golf Club, Inc., v. Conrad*, 2003 WL 22900451, *1-*2 (Ohio Ct. App. 2003). "A jury, however, should only resolve this issue if there is a *true factual dispute, not if the division between goods and services merely involves a close call*." *Id.* (emphasis added). *See e.g.*, *Franklin Publications Inc. v. General Nutrition Corp.*, 2007 WL 2071914 (S.D. Ohio 2007) (Frost, J.) (treating predominant purpose test "as a matter of law" to determine whether UCC applied to breach of contract claims); and *Doe v. SexSearch.com*, 502 F.Supp.2d 719, 731 (N.D. Ohio 2007) (considering as a matter of law whether Ohio's UCC applied to Internet dating service contract and whether contract was for sale of goods or services). Here, though the parties dispute the "predominant purpose" of the contract, there is no dispute regarding what goods and services were within the purview of the Distributor Agreements. Accordingly, the question of whether the Distributor Agreements are governed by the UCC is a question of law for this Court.

In Ohio and elsewhere, "the majority rule is that distributor contracts are sales contracts."

*Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607 (6th Cir. 2001). *See also*, *AKA Distributing Co. v. Whirlpool Corp.*, 137 F.3d 1083 (8th Cir. 1998) (noting that "most courts have concluded that contracts for the distribution of goods are governed by [the UCC]" even where contract includes provisions for product servicing and resolution of customer complaints); *Intercorp., Inc. v. Pennzoil Co.*, 877 F.2d 1524, 1528 (holding that UCC applies to distributor agreements); *Sally Beauty Co., Inc. v. Nexxus Products Co., Inc.*, 801 F.2d 1001, 1006 (7th Cir. 1986) (holding that UCC applies to distributorship agreements, even those with service components); *Paulson, Inc. v. Bromar, Inc.*, 775 F.Supp. 1329, 1333 (D. Hawaii 1991) (applying UCC to distributor agreement as a matter of law, citing "overwhelming precedent from other jurisdictions" that "the UCC does apply to distributor agreements").

This Case involves six Distributorship Agreements. Defendants argue that the following provisions from the Distributorship Agreements "make clear" that they are predominantly for the sale of goods:

- The Distributors were required to purchase a certain quota of Authorized Products (Dist. Agmt. § 7(a)(ii));

- The Distributors were required to forecast purchases of Authorized Products to aid in "scheduling the production and delivery of the Authorized Products" (*Id.* at § 7(a)(i));

- The Distributors were required to use "purchase orders, specifying the quantity and description of Authorized Products and Authorized Software" (*Id.* at § 7(a)(iv));

- The Distributors were to receive and accept the Authorized Products as shipments involving "goods" (*Id.* at § 7(b)(ii));

- The Distributors were required to purchase and maintain a sufficient "inventory" of Authorized Products (*Id.* at §§ 4(c), 7(b)(ii), and 17(a)(ii));

- Payment under the Agreements was related to the amount of Authorized Products and software sold, not services (*Id*. at § 7(a)(v) and 7(b)(i); and

- The Distributors were prohibited from becoming a source of product supply to any other Distributor, or from buying "Authorized Products in bulk" in order to resell them (*Id*. at § 4(k)).

(Defs.' Mot. for Summ. J. at 8).

In addition, Defendants contend that the Distributorship Agreements are filled with "provisions courts have long recognized as the hallmarks of UCC-governed contracts . . . ." (*Id*. at 9 citing *Allied Sales and Serv. Co. v. Global Indus. Tech., Inc.*, 2000 WL 726216, \*5 (S.D. Ala. 2000)). The *Allied Sales* court found that the following provisions, which were contained in the at-issue distributor agreement, demonstrated that the agreement was predominantly one for the sale of goods: "warranty, inspection and return of product, payment of taxes, payment for product, acceptance and rejection of purchase orders, shipment of product, title and risk of loss, liens for payment, insurance, patents and trademarks." Defendants reference the following provisions from the Distribution Agreement in support of their contention:

- Product warranty (Dist. Agmt. § 8);

- Inspection and return of products (*Id*. at §§ 7(b)(ii) and 8(a));

- Payment of taxes on products (*Id*. at § 7(b)(i));

- Acceptance and rejection of purchase orders (*Id*. at §7);

- Shipment of products (*Id*. at § 7);

- Title to product and risk of loss ("Risk of loss shall pass to Distributor F.O.B. Company dock, but Company will assist Distributor in tracking shipments and processing claims for lost or damaged goods.") (*Id*. at § 7(b)(ii));

- Liens for payment (*Id*. at § 7(b)(i)); and

- Patents and trademarks for products (*Id.* at §§ 3 and 14(c)).

(Defs.' Memo. in Opp. at 9).

Finally, Defendants acknowledge that the Distributorship Agreements contain "some service provisions," but assert that such provisions "are meaningless without (and thus incidental to) the sale of the Authorized Products." (*Id.*). Defendants conclude that "[t]he decision here does not even involve a close call," and that the "service-related elements of the contracts, while important, would be meaningless without the goods themselves." (Defs.' Mot. for Summ. J. Reply at 15).

Ultimately, the Court agrees with Defendants that the sale of goods predominates the Distributor Agreements. The Court disagrees, however, with Defendants' statement that the decision "does not even involve a close call," and further, the Court does not arrive at its conclusion because the service-related elements of the Distributor Agreements "would be meaningless without the goods themselves."

As Plaintiffs point out, the Distributor Agreements required Plaintiffs to provide services to customers of Executone telephony products. Specifically, § 4, titled "Distributor's Service Responsibilities," provides in relevant part,

> In order to service adequately customers in Distributor's Area and to ensure consistent nationwide service of Authorized Products and Authorized Software, Distributor shall:
>
> (a)   install and service, subject to Distributor's customary charges and credit criteria, all Authorized Products and Authorized Software, installed in Distributor's Area, regardless of whether they were sold by Distributor, subject to the Cross-Territorial Policy; . . . .
>
> (b)   install and service, upon the request of the Company, Other Company Products for any group of Company Accounts for which Distributor

has executed the applicable Company Account Policy * * * *

(c)    except to the extent that faster response times are reasonably required by Company for Cross-Territorial Accounts or Company Accounts, respond:

    (i)    within 4 hours to all Emergency Service Requests, defined as all requests to remedy problems that are not isolated failures of a minority of station instruments and/or a minority of trunks and/or system components not required for normal processing of voice and/or data communications; and

    (ii)    within 48 hours to 95% of all non-Emergency Service Requests; and

    (iii)    within ten (10) business days to 100% of customers' requests for routine adds, moves or changes of equipment, subject to availability of product from company.  * * * *

(d)    make available emergency service 24 hours a day, 365 days a year;

(e)    as requested by Company, make available installation and service to Cross-Territorial Accounts in Distributor's Area subject to the Cross-Territorial Policy and to Company Accounts * * * *

(f)    maintain trained personnel, spare parts, and equipment sufficient to service all Authorized Products and Authorized Software in Distributor's Area * * * *

(e)    maintain complete records of all service requests and service calls . . . including: . . . any charges; and whether the service was performed under warranty.

The Distributor Agreement also contains other provisions relating to services.  For example, in the recitals, the distributors are described as "sales and service facilities," who "want[] to be appointed to promote the sale and service of the Authorized Products . . . ."  *See also* § 4 (d) (Distributor obligated to timely install products); § 4 (e) (Distributor obligated to train customer's personnel in the operation and use of the product); and § 4 (n) (Distributor obligated to utilize

best efforts to market products).

The service component of the Distributor Agreement is undoubtedly important, but the question for the Court, however, is not whether the service component is important or necessary, but rather whether it is predominate. After thoroughly reviewing the Distributor Agreement and considering the other factors articulated by Judge Carr, the Court concludes that the sales component predominates.

The predominate purpose of the Distributor Agreements was to sell telephony products and software.[3] As highlighted by Defendants, the Distributorship Agreements are filled with provisions courts associate with UCC-governed contracts, including provisions governing: product warranty (Dist. Agmt. § 8); inspection and return of products (Dist. Agmt. §§ 7(b)(ii) and 8(a)); payment of taxes on products (Dist. Agmt.§ 7(b)(i)); acceptance and rejection of purchase orders (Dist. Agmt. § 7); shipment of products (Dist. Agmt. § 7); title to product and risk of loss (Dist. Agmt. § 7(b)(ii)); liens for payment (Dist. Agmt. § 7(b)(i)); and patents and trademarks for products (Dist. Agmt. §§ 3 and 14(c)). Additionally, Distributors were required to purchase a quota of Authorized Products. There is no similar minimum hours requirement with respect to services. *See* Dist. Agmt. § 7(a)(ii) ("Quota is defined as the minimum dollar volume of Authorized Product and Authorized Software in each Product Group that Company expects Distributor to purchase or license from Company and that Distributor commits to purchase from Company.") and Dist. Agmt. Ex. J-1, Distributor's Telephony Quota ("Quota attainment, Required Purchases for Exclusivity and Minimum Purchases are measured by converting all

---

[3]Courts consider software a "good" within the meaning of the UCC. *See e.g.*, *Heidtman Steel Products, Inc.*, 2000 WL 621144, *8; *Advent Systems Ltd. v. Unisys Corp.*, 925 F.2 670, 674 (3d Cir. 1991); and *Comshare, Inc. v. United States*, 27 F.3d 1142, 1149-50 (6th Cir. 1994).

purchases to Net Distributor's Price, which is currently 51.5% discount for Telephony Products and Telephony Software. *Purchases do not include payments for repair services . . . ."* (emphasis added)). EIS was compensated based upon the units Distributor purchased for resale. *See* Dist. Agmt. § 7(a)(v). Likewise, though the Distributors could, under certain circumstances, collect "customary charges" for service calls and installation, Distributors were primarily compensated through product sales. Consumers were ultimately purchasing telephony products—though consumers could purchase EIS products without purchasing or receiving any accompanying services, a consumer could not solicit a Distributor to service any competing products it owned. Indeed, each of the Plaintiffs identified themselves as "a company that sells telephony products to consumers," with no mention of the provision of services. (Compl. ¶¶ 14-19).

Plaintiffs advance three main arguments to attempt to rebut the conclusion that the Distributor Agreements are governed by the UCC. First, Plaintiffs argue that two cases, *AU Rustproofing Ctr., Inc. v. Gulf Oil Corp,* 755 F.2d 1231, 1238 (6th Cir. 1985) and *Independence Tire, Inc. v. Goodyear Tire & Rubber Co.*, 1988 WL 87619 (Ohio Ct. App. 1988), govern this dispute, as opposed to the extensive body of cases that follow the majority rule that distributor contracts are sales contracts. Second, Plaintiffs argue that because this dispute concerns primarily the service-related portions of the Distributor Agreements, the UCC should not apply. Finally, Plaintiffs argue that the service provisions relating to cross-territorial and other policies render the Distributor Agreements predominantly for the sale of services. The Court finds each of Plaintiffs' arguments unavailing because the legal and factual premises upon which they are based are flawed, as discussed below.

The Court finds both cases cited by Plaintiffs unpersuasive. *AU Rustproofing* is

distinguishable, in that it involved *separate* agreements, not one unified contract as here. *Independence Tire* is also unpersuasive because it is devoid of analysis and the statements relied upon by Plaintiffs are dicta.

*AU Rustproofing* involved a dispute between the owner of an Ohio-based automatic carwash chain and gasoline company. 755 F.2d at 1233. The *AU Rustproofing* parties entered into several separate agreements governing the various aspects of their relationship, including a dealership agreement and multiple sales agreements and loan reimbursement agreements. *Id.* at 1233, 1235 (referencing "the many contracts in the record . . ."). The *AU Rustproofing* court, in one section of its opinion, referenced each of the agreements as "*independent* elements of the overall dealership contract" (*Id.* at 1236) (emphasis added), and in another section as "documents in the overall contractual package" (*Id.* at 1238). A careful review of the case reveals that for purposes of analyzing the claims and whether the UCC was applicable, the *AU Rustproofing* court considered each of the agreements *separately*. Accordingly, with respect to the parties' disputes concerning the sales agreements, wherein the sale of goods predominated, the court applied the UCC. *Id.* at 1235-1236 (citing O.R.C. §§ 1302.01(A)(2) official comment 4, 1302.18(B) and 1302.91 official comment 1). And, in connection with the parties' dispute concerning the loan reimbursement and dealership agreements, the court declined to apply the UCC because those agreements were not predominately for the sale of goods. *Id.* at 1238.

Plaintiffs next cite *Independence Tire* for the proposition that under Ohio law, distributor agreements are not governed by the UCC. The court's brief discussion of the UCC was dicta because it was unclear to that court how the trial court had ruled on the plaintiff's breach of contract claim:

> [T]he trial court never journalized its ruling on defendant's motion for directed verdict. Since the verdict was a general verdict, there is no indication from the record that the verdict did not encompass all of plaintiff's claims.
>
> *Assuming arguendo the trial court did direct a verdict in favor of defendant on plaintiff's breach of contract claim,* the initial question becomes whether there exists a cause of action for breach of contract for failure to perform in good faith under the circumstances *sub judice*.

1998 WL 87619, *11.

In addition, perhaps because it was not necessary to its decision, the *Independence Tire* court conducted no substantive analysis of the predominant purpose test. It did not examine the contractual provisions at issue or weigh any factors to determine whether the contract was more about goods or services. Instead, the court's entire discussion was contained in two brief sentences: "[T]he evidence reveals that the contract between the parties was not for a sale of goods but rather was for the establishment of a dealer-manufacturer relationship. As such, the contract is not governed by the principals of the [UCC]." *Id.* at *12. The sole authority the court relied on was *Au Rustproofing,* which as discussed above, is irrelevant to the parties' dispute here.

In sum, neither case cited by Plaintiffs supports their broad statement that "Ohio courts have followed *Au Rustproofing* in holding that the UCC does not govern Distributor Agreements." (*See* Pls.' Memo. in Opp. at 19). Rather, as the Sixth Circuit held in *Watkins*, Ohio law follows the majority rule that Distributor Agreements are governed by the UCC. And, for the foregoing reasons, the Court does not find reason to depart from the majority rule here.

Next, Plaintiffs opine that the Court should find that services predominate because the contractual provisions at issue do not relate to the sale of goods. (Pls.' Memo. in Opp. at 23). The Court acknowledges that some courts have considered which provisions were at issue in the

case when ascertaining whether goods or services predominate. *See e.g.*, *Heidtman*, 2000 WL 621144 at *5. The Court, however, disagrees with this practice. The predominate purpose test turns not on whether the *claims* concern the sale of goods, but instead on whether the *contract* is predominantly for the sale of goods. *See Allied Indus.*, 62 Ohio App.2d at 147. *Cf. Brandt v. Boston Scientific Corp.*, 792 N.E.2d 296, 303-04 (Ill. 2003) (refusing to apply UCC to claim for defective product because predominate purpose of contract was medical services); *Biese v. Parker Coatings, Inc.*, 588 N.W.2d 312, 316-17 (Wis. 1998) (applying UCC to claims for negligently performed services because predominate purpose of contract was for sale of goods). Regardless, the Court rejects as disingenuous Plaintiffs' assertion that the contractual provisions at issue do not relate to the sale of goods. Review of the Complaint reveals that Plaintiffs' relationship was predominately about the sale of goods and that the promises Plaintiffs allege were breached relate specifically to continued provision of goods and the development of new products. Moreover, in opposing Defendants' motion to dismiss or transfer the case, Plaintiffs claimed that Inter-Tel's alleged "decision not to go forward with the Phoenix *product*" was a *principal decision on which this lawsuit is based* . . . ." (Pls.' Memo. in Opp. to Defs' Mot. to Dis. or Tranfer at 16) (emphasis added). Plaintiffs additionally claimed that "another critical decision underlying Plaintiffs' claims" was "the decision to come out with the Tucson product . . . as an Inter-Tel product instead" of an EIS product. (*Id.* at 17). Thus, though Plaintiffs do allege that Defendants breached certain service-related obligations in addition to their goods-related obligations, the clear thrust of their claims relates to goods being sold to them.

Finally, the Court is unpersuaded by Plaintiffs' contention that the Distributor Agreement provisions governing cross-territorial sales and services render the Agreements predominately

about services. (*See* Pls.' Memo. in Opp. at 21). The cross-territorial policies operated as exceptions of modifications to the distributors' authorization to sell products within their designated territories. *See* Dist. Agmt., Ex. D "Cross-Territorial Policy." The policies provided a mechanism for resolving inter-territory disputes between distributors. *See id.* Under the policy, the distributors were granted the authority to sell products outside their territory under certain conditions, including that the headquarters of the customer was located within their own territory. In exchange for this expanded sales authority, distributors were required to assist in installing other distributors' cross-territory sales within their own territories. *Id.* at § 2(b). Thus, the service obligations were the *quid pro quo* for gaining additional ability to sell the authorized products.

The policies concerning National Accounts (Dist. Agmt., Ex. E), Federal Accounts (Dist. Agmt., Ex. F), CCM Accounts (Dist. Agmt., Ex. G), and Health Care Accounts (Dist. Agmt., Ex. H), on the other hand, operated as limitations on the distributors' authority to sell authorized products within their designated territories. Under these policies, Defendants reserved the ability to sell the authorized products to certain specified customers, but required the distributors to provide installation services. Thus, these policies did, as Plaintiffs point out, require Plaintiffs to service accounts that they did not sell. However, when viewed as a limitation on the distributors' authorization to sell products to certain identified customers, it is evident that the sale of goods remained at the heart of these policies.

Moreover, payments to Plaintiffs under these policies were inextricably tied to the sale of goods. Under the Cross-Territorial, National, and Federal Accounts Policies, Plaintiffs were paid a commission on each sale at 15% of the invoice price. (*see* Dist. Agmt., Ex. D, § 2(c); Ex. E, § 2(c)(iii); Ex. F, § 2(c)). Under the CCM Accounts, Plaintiffs were issued a credit they could use

to purchase additional goods or to reduce the price of goods they had already recieved. (Dist. Agmt., Ex. G, § 8).

The Court finds that the thrust of these cross-territorial policies was not the provision of services. Instead, the policies were designed to provide a mechanism to avoid cross-territorial disputes and to reserve the Defendants' right to sell products directly to certain customers. The services provided by Plaintiffs pursuant to these policies—like the services to be provided by Plaintiffs under the other provisions of the Distributor Agreements—were designed with one purpose in mind: to promote the sale of telephony products.

In conclusion, it is clear as a matter of law that the Distributor Agreements were predominantly for the sale of goods. Though Plaintiffs did have servicing responsibilities, the record evidence demonstrates that these responsibilities were incidental to the selling of telephony products. Thus, the Court finds that Article 2 governs the Distributor Agreements and that Plaintiffs' breach of contract claims are consequently time-barred by the UCC's four-year statute of limitations. Having determined that Plaintiffs' breach of contract claims are barred by the applicable statute of limitations, the Court finds it unnecessary to address Defendants' alternative and supplemental arguments in support of summary judgment on these claims.

**B. Plaintiffs' Promissory Estoppel Claims**

Defendants advance several alternative arguments in support of their request for judgment as a matter of law on Plaintiffs' promissory estoppel claims. Defendants first argue that Plaintiffs' promissory estoppel claims are actually fraud claims, and therefore, the claims are time-barred by Ohio's four-year limitations period for fraud claims. (Defs.' Mot. for Summ. J. at 13). Alternatively, Defendants contend that the promissory estoppel claims are time-barred, in whole

or in part, by Ohio's "borrowing statute." (*Id.* at 15). Next, Defendants argue judgment in their favor is proper because express written contracts cover the same subject of the claims. (*Id.* at 17). Finally, Defendants argue they are not liable under the doctrine of promissory estoppel for alleged "promises" it made to Plaintiffs because Plaintiffs have not established detrimental reliance, which is an essential element of a promissory estoppel claim. (Defs.' Supp. Mot. for Summ. J. at 1-2, 16-22). The Court examines each of Defendants' arguments in turn.

### 1.    Applicability of Ohio's Limitations Period for Promissory Fraud

Defendants argue that Plaintiffs' promissory estoppel claims should be time-barred by the four-year statute of limitations period applicable to promissory fraud claims because the true nature of Plaintiffs' action is one for promissory fraud. (Defs.' Mot. for Summ. J. at 13-15). Defendants cite *Minger v. Green,* 239 F.3d 793, 799 (6th Cir. 2001), for the proposition that in considering the true nature of a cause of action, courts must "not rely solely on labels in a complaint" but must "probe deeper and examine the substance of the complaint." *Accord, Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984) ("The grounds for bringing the action are the determinative factors, the form is immaterial."). Defendants then opine that examination of the stated grounds for Plaintiffs' promissory estoppel claim "make clear that, in reality, it is a promissory *fraud* claim based on the statements Plaintiffs allege were knowingly and intentionally false when made." (Defs.' Mot. for Summ. J. at 14). Specifically, Defendants reference Plaintiffs' allegations that Inter-Tel "did not inform the dealers of its *true plan*" for the Executone products and acquisition. (*Id.* citing Compl. ¶ 32 (emphasis added)). Defendants conclude that "[i]t is well-settled that such claims sound in fraud, not estoppel," citing *Coal Resources, Inc. v. Gulf & Western Industries, Inc.*, 756 F.2d 443, 446 (6th Cir. 1995), as

authority, a case which provides: "[M]aking a contractual promise with no present intention of performing it constitutes promissory fraud in Ohio." (*Id.*).

Plaintiffs do not dispute that such allegations form the basis for a promissory fraud claim. Instead, Plaintiffs counter that they "are the masters of their own Complaint, and [they] chose not to bring any fraud claims." (Pls.' Memo. in Opp. at 34-35). Plaintiffs contend that promissory estoppel and fraud claims are not mutually exclusive, and opine that the "sole question" for the Court is "whether Plaintiffs have pled sufficient elements to support promissory estoppel claims." (*Id.* at 35). Plaintiffs conclude that they have sufficiently plead the elements of a promissory estoppel claim, and therefore, their claims are governed by the six-year statute of limitations period set forth in O.R.C. § 2305.07. (*Id.* at 34-38). The Court agrees with Plaintiffs.

The Court's agreement with Plaintiffs does not, as Defendants suggest, run afoul of *Minger*. In *Minger,* the district court had concluded that the defendant was being sued only for negligence and was immune because he was performing a discretionary act within the scope of his authority. 239 F.3d at 798. The district court reached this conclusion because the plaintiff's complaint stated that her claim was based on the defendant's negligent misrepresentation. *Id.* at 799. The Sixth Circuit Court of Appeals looked beyond the labels of the complaint to the substance of the allegations and discovered that the plaintiff had stated a claim against the defendant for knowingly committing the wrongful act of intentionally misrepresenting material information. *Id.* Based upon this discovery, the *Minger* Court reversed the district court, ruling that the plaintiff had sufficiently alleged that the defendant had intentionally misrepresented material facts. *Id.* at 798-99. In reaching its conclusion, the *Minger* Court explained that pleadings should be construed liberally in accordance with the notice pleading requirements of the

Federal Rules:

> Federal Rule of Civil Procedure 8(f) states that "All pleadings shall be so construed as to do justice." This rule directs courts to construe pleading liberally within the standards of the notice-pleading regime mandated by the Federal Rules of Civil Procedure. As this court has stated, "the fundamental tenor of the Rules is one of liberality rather than technicality, and it creates an important context within which we decide cases under the modern Federal Rules of Civil Procedure." *Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir. 2000). Therefore, the Rules require that we not rely solely on labels in a complaint, but that we probe deeper and examine the substance of the complaint.

*Id*. at 799. The *Minger* Court then discussed a Fourth Circuit case in which the appellate court overturned the trial court's dismissal of a plaintiff's "sexual molestation" claim. *Id.* (citing *Labram v. Havel*, 43 F.3d 918 (4th Cir. 1995). The *Labram* district court had dismissed the claim on the basis that Nevada law did not recognize a separate tort action for "sexual molestation." On appeal, the Fourth Circuit found that the claim should not have been dismissed "in a proper application of federal 'notice pleading' principles." 43 F.3d at 920. The court relied on Fed.R.Civ.P. 8(a)(2), which requires only that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* The court determined that the defendant was not prejudiced by the mislabled claim because the pleadings gave the defendant fair notice of the "nature and basis or grounds of the claim" and served as a "general indication of the type of litigation involved." *Id*. at 921. After discussing *Labram*, the *Minger* Court went on to analyze whether the *Minger* plaintiff's complaint sufficiently plead the elements of a misrepresentation claim, finding that it did. *Id.*

Thus, *Minger* instructs courts to construe pleadings liberally in compliance with Fed.R.Civ.P. 8(a)(2) and to look beyond the claim labels, examining the substance of the allegations, before dismissing a claim.

"Under Ohio law, the 'elements of a promissory estoppel claim are (1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise.'" *Sweitzer v. American Express Centurion Bank*, 554 F.Supp.2d 788, 796 (S.D.Ohio 2008) (Smith, J.) (quoting *Weiper v. W.A. Hill & Assoc.*, 104 Ohio App.3d 250, (1st Dist. 1995), *appeal denied*, 74 Ohio St.3d 1446 (1995) (internal punctuation omitted)). *See also Holt v. Company of Ohio v. Ohio Machinery Co.*, 2001-Ohio-5557 (10th Dist. 2007) (same).

Plaintiffs have pled all of these elements. First, Plaintiffs have pled that Inter-Tel made the following "clear and unambiguous" promises:

(a)     that Inter-Tel planned to continue providing the existing Executone products to the Executone dealer channel indefinitely;

(b)     that Inter-Tell would keep the Executone name indefinitely and that Inter-Tel planned to maintain the Executone brand and channel as a separate and distinct channel;

(c)     that Inter-Tell would bring the Phoenix and Tucson projects to completion and introduce them to the market as Executone products;

(d)     that Inter-Tel would release three versions of the Phoenix product on specified dates;

(e)     Inter-Tel would make existing Executone products available to Plaintiff on specified dates; and

(f)     that Inter-Tell was developing enhancements for the IDS telephone system and would release them in 2000.

(Compl. ¶ 55(a)-(f)). Second, Plaintiffs have pled that Plaintiffs relied on these promises by "continu[ing] their business relationships with Inter-Tel, continu[ing] to purchase products for

resale from Inter-Tel, and disclos[ing] confidential information to Inter-Tel." (*Id*. at ¶ 56). Third, Plaintiffs have pled that this reliance was reasonable and foreseeable and that "Inter-Tel in making these promises, reasonably expected or should have expected to induce action or forebearance of a definite and substantial character . . . ." (*Id*.). Fourth and finally, Plaintiffs have pled injury. (*Id*. at ¶ 57).

The fact that Plaintiffs' allegations would also support a fraud claim is not unusual—"The elements of a common-law fraud claim are extremely similar to the elements of promissory estoppel." *Chrysalis Health Care, Inc. v. Brooks,* 65 Ohio Misc.2d 32, (1994); *see also Watkins*, 254 F.3d at 612 ("Reasonable reliance is an element of both promissory estoppel and fraud." (citations omitted)). Nor is it fatal to their promissory estoppel claim. Defendants have cited no authority demonstrating that promissory estoppel and fraud claims are mutually exclusive or that they cannot be pled in the alternative or that pleading irrelevant facts dooms a claim.

Defendants correctly point out that Plaintiffs would be time-barred from bringing a promissory fraud claim by Ohio's four-year statute of limitations period governing fraud claims. *See* O.R.C. § 2305.09(c). Consequently, any potential claims for promissory fraud are time-barred, and thus, even if Plaintiffs could prove that the alleged representations were false when made, they cannot recover the broader range of damages available in a fraud action. Instead, Plaintiffs are limited to contract-type damages, and the determination of whether the alleged representations were false when made is wholly irrelevant.

In summary, the Court rejects Defendants' contention that Plaintiffs' promissory estoppel claims are time-barred by the four-year limitations period applicable to promissory fraud claims.

> **2.    Applicability of Ohio's "Borrowing Statute"**

As an alternative to their argument that Plaintiffs' promissory estoppel claims should be time-barred by the four-year statute of limitations period applicable to promissory fraud claims, Defendants argue that Ohio's "borrowing statute" bars the claims of the Missouri and Georgia Distributors, and limits the claims of the Distributors from Alabama, Ohio and Tennessee. (Defs.' Mot. for Summ. J. at 15). Plaintiffs disagree.

Ohio's borrowing statute provides that the statute of limitations for the state where the cause of action arose will bar that claim in Ohio if the other state's limitations period has already expired:

**2305.03 Lapse of time as bar to civil action**

(A)    Except as provided in division (B) of this section and unless a different limitation is prescribed by statute, a civil action may be commenced only within the period prescribed in sections 2305.04 to 2305.22 of the Revised Code. If interposed by proper plea by a party to an action mentioned in any of those sections, lapse of time shall be a bar to the action.

(B)     No civil action that is based upon a cause of action that accrued in any
        other state, territory, district, or foreign jurisdiction may be commenced
        and maintained in this state if the period of limitation that applies to that
        action under the laws of that other state, territory, district, or foreign
        jurisdiction has expired or the period of limitation that applies to that action
        under the laws of this state has expired.

O.R.C. § 2305.03.  The purpose of the borrowing statutes is to prevent forum shopping.  *See,*

*e.g.*, *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 596 (6th Cir. 2004); *Curl v. Greenlee Textron, Inc.*,

404 F.Supp.2d 1001 (S.D. Ohio 2005) (Marbley, J.) (same).  Borrowing statutes are part of the

procedural law of the forum state that must be applied by a court exercising diversity jurisdiction.

*Willits v. Peabody Coal Co.,* 1999 WL 701916, *11 (6th Cir. 1999) (affirming that district court

properly applied Kentucky borrowing statute "because a federal court sitting in diversity must

apply the procedural law of the forum state, including its statutes of limitations.").

        Plaintiffs contend that *Cole v. Mileti*, 133 F.3d 437 (6th Cir. 1998) requires this Court to

apply Ohio's fifteen-year limitations period because Ohio is the forum state. (Pls.' Memo. in Opp.

at 27-28).  In *Cole*, the Six Circuit refused attempts to apply a statute of limitations other than

Ohio's to claims brought in Ohio but accruing out of state. 133. F.3d at 437.  The Court

explained:

        It is well-established that federal courts sitting in diversity must apply the
        choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*,
        313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); *Charash v.*
        *Oberlin College*, 14 F.3d 291, 296 (6th Cir.1994). Mileti does not dispute this
        proposition. Rather, he erroneously contends the Ohio courts have judicially
        preserved the effect of Ohio's old borrowing statute, notwithstanding the fact that
        the Ohio legislature repealed the statute over thirty years ago.

*Id.*

        Plaintiffs' reliance on *Cole* is misplaced for two reasons.  First, *Cole* was decided in 1998,

when Ohio had no borrowing statute on the books and before the borrowing statute was enacted on April 7, 2005. *See Cole*, 133 F.3d at 436-37. Thus, *Cole* did not address the applicability of the borrowing statute. Second, *Cole* did hold that under Ohio law, the appropriate statute of limitations was to be determined by reference to the Restatement (Second) of Conflict of Laws (1971 ed.). *Id.* at 437. *Cole* thus acknowledges that, even absent a borrowing statute, Ohio's procedural law includes a choice-of-law analysis regarding which state's statute of limitations to apply. *See also Curl*, 404 F.Supp.2d at 1009 (holding that, for claims not subject to the borrowing statute, Ohio law applies Section 142 of the Restatement (Second) of Conflict of Laws Section to determine the applicable statute of limitations).[4]

---

[4]In *Cole*, the court applied Section 142 of the Restatement (Second) Conflict of Laws (1971). *Id.* That iteration of Section 142 provides in relevant part:

> (1) An action will not be maintained if it is barred by the statute of limitations of the forum, *including a provision borrowing the statute of limitations of another state*;
>
> (2) An action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state.

Restatement (Second) of Conflicts of Laws § 142 (1971) (emphasis added). Because Ohio had no borrowing statute at that time, subsection (1) did not apply. Thus, *Cole* applied Section 142(2) and held that Ohio's limitations period, rather than a borrowed limitations period, would apply. *Cole*, 133 F.3d at 436–37.

In *Curl*, the court applied Section 142 as revised in 1988. *Curl*, 404 F. Supp. 2d at 1011. The revised section states that "Whether a claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6." Restatement (Second) Conflict of Laws § 142 (1988). Section 6, in turn, states that "[a] court . . . *will follow a statutory directive of its own state on choice of law.*" *Id.* § 6 (emphasis added).

Plaintiffs next argue that the borrowing statute cannot be applied retroactively to claims accruing before April 7, 2005. (Pls.' Memo. in Opp. at 28). Plaintiffs explain that Ohio's borrowing statute had an effective date of April 7, 2005. Because Plaintiffs' promissory estoppel claims accrued prior to April 7, 2005, Plaintiffs contend that any application of the borrowing statute would be impermissibly retroactive. (*Id.* at 29-31). For authority, Plaintiffs cite *Curl*, 404 F.Supp.2d 1001, *D.A.N. Joint Venture III, L.P. v. Armstrong*, 2007-Ohio-898,(Ohio App. 11 Dist. 2007) and Section 28 of Article II of the Ohio Constitution. (*Id.* at 30-31).

Section 28 of Article II of the Ohio Constitution provides: "The General Assembly shall have no power to pass retroactive laws." The parties agree that, consistent with Section 28 of Article II of the Ohio Constitution, O.R.C. § 2305.03 should not be applied retroactively. *Accord*, *Curl*, 404 F.Supp.2d at 1008 ("[T]here [is] no precedent showing that Ohio courts would apply § 2305.03 retroactively."); *D.A.N*, 2007-Ohio-898, at ¶ 29 ("Amended R.C. 2305.03(B) cannot be applied retroactively . . . .").

Defendants, however, contend that if applied here, the application is not retroactive because *the borrowing statute was in effect at the time the case was filed.* (Defs.' Reply to Mot. for Summ. J. at 17). Defendants posit that the cases cited by Plaintiffs are inapposite because the complaints in each were filed before the borrowing statutes was enacted. *See D.A.N.,* 2007-Ohio-898, at ¶ 11 (noting March 21, 2000 complaint); *Curl*, 404 F.Supp.2d at 1003 (noting October 10, 2003 complaint).

In *D.A.N.*, the court declined to apply O.R.C. § 2305.03(B) explaining:

R.C. 2305.03 did not take effect until after D.A.N. filed its suit against Armstrong (seventeen days after suit was filed to be precise). Amended R.C. 2305.03(B) cannot be applied retroactively inasmuch as it would deprive D.A.N. of the right to

sue for the recovery of debt.

2007-Ohio-898, at ¶ 29. In reaching this conclusion, the *D.A.N.* court relied on the following

holding from the Ohio Supreme Court in *Gregory v. Flowers*, 32 Ohio St.2d 48, at paragraph

three of the syllabus (1972): "When the retroactive application of a statute of limitation operates

to destroy an accrued substantive right, such application conflicts with Section 28, Article II of

the Ohio Constitution."

Based upon the *D.A.N.* court's reliance on *Gregory* to reach its conclusion, Plaintiffs

opine that the *D.A.N.* court would have refused to apply Ohio's borrowing statute even if the

*D.A.N.* plaintiff had not made it to the courthouse steps until after April 7, 2005, because such an

application would destroy an accrued substantive right in violation of Section 28, Article II of the

Ohio Constitution.

Thus, the question for the Court is whether Ohio's borrowing statute applies to claims that

have accrued before the statute was enacted. Courts presented with facts such as those presented

here have gone both ways. For example, in *Ormand v. Anthem*, the court declined to apply

O.R.C. § 2305.03(B) where all of the plaintiff's claims accrued before the borrowing statute's

effective date even though the complaint was filed after the effective date:

> Ohio's "borrowing statute" went into effect on April 7, 2005. All of the plaintiffs'
> common law claims accrued before April 7, 2005. In *State v. LaSalle*, 772 N.E.2d
> 1172, 1175 (Ohio 2002), the Ohio Supreme Court stated: "absent a clear
> pronouncement by the General Assembly that a statute is to be applied
> retrospectively, a statute may be applied prospectively only." There is no evidence
> that the Ohio General Assembly intended its borrowing statute to be applied
> retrospectively. *See Curl*, 404 F.Supp.2d at 1008. Ohio's borrowing statute does
> not bar any of the plaintiffs' common law claims.

2008 WL 906157, *19 n.12 (S.D. Ind. 2008). In contrast, in *Wolper v. Hotel Europe*, 552

F.Supp.2d 687, 691 (N.D. Ohio 2008) and *Eberly v. Optimum Nutrition, Inc.*, 2007 WL 2034279, *9 (N.D. Ohio 2007), the courts employed Ohio's borrowing statute, barring claims on facts such as those in *Ormand* and the instant case, where the cause of action accrued prior to O.R.C. § 2305.03(B)'s effective date. Unlike the *Ormand* opinion, however, the *Wolper* and *Eberly* opinions are devoid of any analysis concerning whether the application of O.R.C. § 2305.03(B) to claims that have accrued before the statute was enacted is proper.

This Court agrees with the *Ormand* court's ruling. Plaintiffs' promissory estoppel claims accrued—and therefore vested—*prior* to the borrowing statute's effective date. "Once vested, . . . a cause of action clearly becomes a substantive right for purposes of Section 28, Article II." *Groch v. General Motors Corporation*, 117 Ohio St.3d 192, 225 (2008) (citing *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 107 (1988)). Application of O.R.C. § 2305.03(B) to Plaintiffs' promissory estoppel claims would result in those claims being time-barred. Put another way, application of the borrowing statute in the instant case would result in the destruction of an accrued substantive right. This result runs afoul of the Ohio Supreme Court's holding in *Gregory*. 32 Ohio St.2d at paragraph three of the syllabus.

Accordingly, the Court rejects Defendants' contention that Ohio's borrowing statute bars or limits Plaintiffs' promissory estoppel claims.

### 3. Effect of Distributor Agreements

Defendants argue that Plaintiffs' promissory estoppel claims fail because the Distributor Agreements cover the same subject. (Defs.' Mot. for Summ. J. at 18). Specifically, Defendants maintain that each representation on which Plaintiffs base their promissory estoppel claim concerns the sale and distribution of EIS telephony products, which is governed by the Distributor

Agreements. (*Id.* at 18).  Plaintiffs dispute Defendants' assertions.

A "plaintiff cannot invoke the doctrine of promissory estoppel on the basis of alleged promises that contradict [a] written contract." *Kashif v. Cent. State Univ.*, 133 Ohio App.3d 678, 684 (Ohio App. 10 Dist. 1999); *see also Borowski v. State Chem. Mfg. Co.,* 97 Ohio App.3d 635, 643 (1994) ("Promissory estoppel does not apply to oral statements made prior to the written contract, where the contract covers the same subject matter."); and *Lippert v. University of Cincinnati,* 1996 WL 566012, *4 (Ohio App. 10 Dist. 1996) ("While this court allows promissory estoppel claims to be argued alternatively to breach of contract claims . . .  the oral agreement on which the promissory estoppel claim is based cannot be used to alter the unambiguous written contract.").  When the alleged promises do not contradict the existing written contract, however, extrinsic evidence can be introduced to support a promissory estoppel claim.  *See e.g.*,  *Miller v. Lindsay-Green, Inc.*,  2005 WL 3220215 (Ohio App. 10 Dist. 2005).

Defendants contend that the alleged promises fall within the express scope of the Distributor Agreements' requirements that Defendants:

> (g) act in good faith and in a fair, equitable, and ethical manner both to Distributor and end-users with respect to all matters covered by this Agreement; and

> (h) utilize its best efforts to provide to Distributor Authorized Products that are competitive in the marketplace in function, features and price. Distributor and Company recognize that, from time to time, Company will develop and introduce new products bearing the Authorized Trademarks . . . . Company intends to make such new Authorized Products available to Distributor for Distributor's Area on the same exclusive or non-exclusive basis as applies to the Authorized Trademark Brands hereunder.

Dist. Agmt. § 2(g)-(h). Defendants conclude that the alleged promises are "nothing more than promises to perform under the Distributor Agreements," and therefore, "are barred because the

express written Distributor Agreements cover the same subject matter." (Defs.' Reply to Mot. for Summ. J. at 23).

Plaintiffs counter that the promises which form the basis of Plaintiffs' promissory estoppel claims are not promises contained in the Distributor Agreement or any other written contract. (Pls.' Memo. in Opp. at 38). Rather, Plaintiffs assert that the at-issue promises were made even *before* Defendants assumed the obligations under the Distributor Agreements. Plaintiffs opine that therefore, when Defendants assumed the Distributor Agreements, they were not under any obligation to continue the Executone name and dealer channel through the Distributor Agreements' expiration date. (*Id*. at 38-39 (citing Dist. Agmt. § 15(a)). Likewise, Plaintiffs posit that Inter-Tel was under no obligation to continue development on the IDS family of products and the Phoenix project, to develop an Executone Keyset Card that would allow Executone phones to work with Inter-Tel's AXXESS system, or to release an Executone-branded AXXESS system. (*Id*. at 39). Plaintiffs conclude that their promissory estoppel claims are distinct from their contract claims. (*Id*.).

Plaintiffs' promissory estoppel claims arise from Defendants' alleged promises to:

- Continue providing Executone products indefinitely;

- Maintain the Executone name and brand indefinitely;

- Complete and introduce Phoenix and Tucson products;

- Release three versions of the Phoenix product on specified dates;

- Make existing Executone products available to Plaintiff on specified dates; and

- Develop system enhancements for the IDS telephone system and release them in 2000.

(Compl. ¶ 55(a)-(f)).

The alleged promises that form the basis for Plaintiffs' promissory estoppel claim do not contradict the Distributor Agreement language cited by Defendants. Defendants' statements that the alleged promises are "nothing more than promises to perform under the Distributor Agreements" is disingenuous. The Distributor Agreement provisions referenced by Defendants are ambiguous good faith and best efforts clauses—there is no mention of obligations relating to specific deadlines for specific product lines or durational requirements.

Accordingly, the Court rejects Defendants' contention that Plaintiffs' promissory estoppel claims fail because the Distributor Agreements cover the same subject.

### 4. Reliance

Finally, Defendants argue they are not liable under the doctrine of promissory estoppel for alleged "promises" they made to Plaintiffs because Plaintiffs have not established detrimental reliance, which is an essential element of a promissory estoppel claim. (Defs.' Supp. Mot. for Summ. J. at 1-2, 16-20).

As set forth above, "[u]nder Ohio law, the 'elements of a promissory estoppel claim are (1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise.'" *Sweitzer v. American Express Centurion Bank*, 554 F.Supp.2d 788, 796 (S.D.Ohio 2008) (Smith, J.) (quoting *Weiper v. W.A. Hill & Assoc.*, 104 Ohio App.3d 250, (1st Dist. 1995), *appeal denied*, 74 Ohio St.3d 1446 (1995) (internal punctuation omitted)). *See also Holt v. Company of Ohio v. Ohio Machinery Co.*, 2001-Ohio-5557 (10th Dist. 2007) (same).

A promissory estoppel cause of action is governed by the law of the state that has "the most significant relationship to the dispute." *Limited Stores, Inc. v. Pan American World Airways, Inc.*, 65 Ohio St.3d 66, 70 (1992). Here, there is no conflict of laws regarding Plaintiffs' burden of proving that they relied upon Defendants' statements to their detriment. Every state with a relationship to the present dispute has adopted the detrimental reliance requirement for promissory estoppel that is set forth in Restatement of Contracts (2d), Section 90. This includes Arizona, the state where Inter-Tel made the alleged promises, *see Double AA Builders, Ltd. v. Grand State Construction*, 114 P.3d 835 (Ariz. App. 2005), and the five states where Plaintiffs' distributorships operated and their losses allegedly occurred: Alabama, *see McWilliams v. American Medical International, Inc.*, 960 F.Supp. 1547 (N.D. Ala. 1997), rev. in part on other grds., 198 F.3d 263 (11th Cir. 1999); Georgia, *see Wright v. Newman*, 467 S.E.2d 533 (Ga. 1996); *Missouri, see Kearney Commercial Bank v. Popejoy*, 119 S.W.3d 143 (Mo. App. 2003); Tennessee, see *Barnes & Robinson Co. v. OneSource Facility Services, Inc.*, 195 S.W.3d 637 (Tenn. App. 2006); and Ohio, see *Talley v. Teamsters, Chauffeurs, Warehousemen, and Helpers, Local No. 377*, 48 Ohio St.2d 142, 146 (1976). (*See* Compl. ¶¶ 1-8.) "[A]n actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken." *Glidden Co. v. Lumbermens Mutual Casualty Co.*, 112 Ohio St.3d 470, 474-75 (2006). There is no such conflict here.

The determination of whether a party has established the reliance element of a promissory estoppel claim is "generally [a] question[] of fact for a jury to resolve." *Hale v. Volunteers of America*, 158 Ohio App.3d 415, 429 ¶ 50 (Ohio App. 1 Dist. 2004) (citing *Uebelacker v. Cincom Systems, Inc.*, 48 Ohio App.3d 268, 273 (1988); *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d

100, 155 (1985). Courts have recognized, however, that the reliance element of a promissory estoppel claim can properly be adjudicated in summary judgment proceedings where the claimant has failed to present evidence of reliance. *See, e.g., Morgan v. Del Global Technologies Corp.,* 2007 WL 3227068, *19-20 (S.D. Ohio 2007) (Rose, J.) (dismissing promissory estoppel claim for unpaid accrued vacation where plaintiff failed to present evidence that he relied upon employer's representation that he would be paid for unused accrued vacation).

Plaintiffs, in their Complaint, plead that they relied on Defendants' promises by "continu[ing] their business relationships with Inter-Tel, continu[ing] to purchase products for resale from Inter-Tel, and disclos[ing] confidential information to Inter-Tel." (Compl. ¶ 56). Plaintiffs have presented evidence demonstrating that they did, in fact, do these things.

Though Defendants' briefing raises factual issues relating to the existence and extent of the alleged reliance, the reasonableness of the alleged reliance, and also the extent of the injuries sustained as a result of any alleged reliance, when examining all of the evidence in the light most favorable to Plaintiffs, the Court concludes Plaintiffs have presented evidence sufficient to prove reliance. *See Ruzicka v. Conde Nast Publ'ns, Inc.*, 999 F.2d 1319, 1322 (8th Cir.1993) ("Because the elements of promissory estoppel are fact dependent, they necessarily involve fact-finding and require inquiry into the circumstances surrounding the making of the promise and the promisee's reliance. * * * Both the existence and the scope of the promise, as well as the promisee's reliance upon it will be subject to a fairly flexible standard of proof.") (citing Samuel Williston, Williston on Contracts § 8:5, at 102 (Richard A. Lord ed. 4th ed. 1992).

Therefore, the Court finds that whether or not Plaintiffs have established the reliance element of their promissory estoppel claim remains a question of fact for the jury to resolve, and

accordingly, the Court rejects Defendants' final argument in favor of summary judgment on Plaintiffs' promissory estoppel claim.

## IV.    DISPOSITION

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 88) and **DENIES** Defendants' Supplemental Motion for Summary Judgment (Doc. 135).

Plaintiffs' breach of contract claims are dismissed with prejudice.  Plaintiffs' promissory estoppel claims remain.

The Clerk shall remove Documents 88 and 135 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**